Good morning. May it please the Court, Michael T. Scott on behalf of the Plaintiff Appellant, Carlos Moore. I'd like to start today by talking about a case called Briggs v. Mississippi. It's a case that dealt with the very same flag at issue in this case. Like this case, the plaintiff there alleged that the Mississippi flag constituted some sort of symbolic government speech. Like the plaintiff in this case, the plaintiff in the Briggs case alleged that the flag unconstitutionally expressed a preference for one group of citizens over another. The only difference was that in Briggs' case, the plaintiff was a Muslim, objected to the flag on the basis that he believed it endorsed Christianity, that the Confederate battle flag portion of the flag, of the Mississippi flag, somehow constituted a religious symbol, a Christian symbol to be precise, and he objected to that. The district court and this court proceeded to decide the merits without any expression of concerns about standing. The outcome in that case really can't be reconciled with the denial of standing in this case. Here the plaintiff correctly alleges, as the Fifth Circuit court held in Briggs, that the message of that flag is not a religious message, it's a secular message. That's the allegation that's made here. The allegation goes on and specifies, there was no need to specify what the secular message was in the Briggs case, but here the allegation is the message is one of white supremacy. That claim arises under the Equal Protection Clause. The claim in the Briggs case arose under the Establishment Clause. But other than that difference, there's really no way to reconcile those two cases. And it's not because the decision in Briggs was wrong. In fact, if you look at the ---- Roberts, why isn't it just very simply, it's not that there's a hierarchy, it's not that the case-in-controversy requirement alters, it is what's the text of the Constitution? And in one case, the text protects against the government endorsing something. So the Establishment Clause protects against the endorsement, but the Equal Protection Clause protects against unequal treatment. So we have to look for different treatment. Well, the language of the two clauses, I would submit, are not really that different. That's the distinction. In other words, I guess, put it differently, do you have a single equal protection violation case based ever on government speech? No, Your Honor. I'll be very candid to say no, except for those two Eleventh Circuit cases that happen to deal with the Confederate flag. Right. They get there, but they don't — it doesn't seem that standing was contested there, right? There's no addressing. Well, that's correct. The standing was not contested. I agree. Those are interesting cases. Those cases, standing was not contested. There were equal protection claims in those cases. And those plaintiffs, you know, they all ---- What about any equal protection case that finds standing based on stigma without an attendant finding of unequal treatment? I don't think so, Your Honor. And the reason for this is, you know, if you look at the religious cases ---- I know, but those just seem like separate doctrines. So if we focus just on equal protection, there's a real dearth of case law to support your position. No case law. Well, there's a complete absence of case law against ---- But does your argument turn on incorporating standing from establishment clause? It turns on there being an analogy that can be drawn there. I think it has to be drawn. But then ---- Yeah. Yes, yes. Okay. But, you know, this is to a large extent an issue of first impression. Yeah. When the government speaks in a way that diminishes, demeans one racial group over another, is that a violation of equal protection? Well, that's more of a merits issue. Really? But you can't even cite a case where it was decided favorably on the merits based on speech alone rather than treatment. But ---- So even if we jump to merits, there doesn't seem that that's a valid equal protection theory. The State cannot cite a single case where that theory has been rejected. The whole notion of government speech is fairly new jurisprudential concept as it's being discussed. And the reason there aren't equal protection cases out there where somebody says, well, does government speech violate the equal protection clause, other than this flag? You can't find government insignias. You can't find government displays that expressly, explicitly are designed to promote white supremacy. Where do you find that other than in this flag? Municipal authorities are very prone to putting crosses in their city insignias, to putting up Christmas displays. So you have a lot of cases dealing with the standing to bring those challenges under the Establishment Clause. You really don't have government agencies or cities or counties which openly endorse white supremacy. It just doesn't happen. That's why we don't have a case. Not because there are cases out there rejecting our position. There just aren't any cases. This case is in many ways unique. And one of the ways it's unique is that it is a government endorsement of white supremacy. Right. And I know we have to prove that at trial. Well, but you drop back to an endorsement. But that doesn't seem to be what the Constitution is protecting against. Well, the Constitution is very broad. The Equal Protection Clause says State shall not deny equal protection. But there was no legal benefit. The law. This gentleman works. I mean, your client has worked or does work as a State prosecutor. Yes. So he hasn't been denyed. denied to him or any legal benefit, then he isn't getting equal protection of the law. No one's — I don't think Mississippi is saying they condone offensive speech that they're denying his feelings and that he feels offended. It's just that the law doesn't say that's cognizable to get into court. Well, it doesn't say it isn't either. The equal protection — equal protection. If the State comes out, let's suppose the State openly passed a resolution that white supremacy is good and African Americans are inferior. But that's all they did. They simply did that. They didn't deny people jobs. They didn't deny people housing. But they proclaimed that in written form, in documents, adopted unanimously by the legislature. Would that be a denial of the equal protection rights of citizens, African American citizens who lived in Mississippi? Absolutely. It just doesn't happen. What we have is this symbolic endorsement of the same thing. I find it interesting that the complaint, and I'm looking at the third amended complaint, the last one allowed. I don't have the fourth amended in front of me. It's basically an equal protection class of one claim. It's not seeking relief for himself and all others similarly situated or all other black residents of Mississippi, et cetera. So it's an equal protection class of one. It's exactly like all those—it's like Murray. Murray said, I'm a prominent atheist. Again, we're talking about the Establishment Clause. I agree, Your Honor, but there are numerous reasons why the Establishment Clause precedent should apply here. You start with—I've addressed to some extent— Well, I think in your brief you—because I was very curious about that. In your brief, you say you're not raising claims under the 13th Amendment and that you're not claiming there's flag-inspired racial violence. You say that in your brief at 13.02. Let me finish, counsel. Then in your reply brief, you at 6 say you're not raising a question about equal—the Establishment Clause. You're simply showing it's an analogous situation. So, you know, you seem to be in your brief saying, well, it should be persuasive, but here you seem to be saying it's controlling. So which is it? Well, it is controlling in the sense that there is no principled, no constitutional, no logical basis to draw a distinction between a plaintiff who claims the State is demeaning me because of my race or the State is demeaning me because of my religion. Other than the exact wording of the Constitution. Well, there are slightly different words, but we also have the Valley Forge decision which says, look, when it comes to standing, there's not some hierarchy of constitutional values. There's not a sliding scale of standing. And frankly, if there were a sliding scale of standing, it would cut in our favor, not against us. I mean, the Equal Protection Clause had as its core purpose, as explained in the Slaughterhouse cases very close in time to when the Fourteenth Amendment was adopted, that the very purpose was the protection of African Americans, to enable them to enjoy the full benefits of citizenship as full, not second-class citizens. Then you look at the Establishment Clause. There was no concern about atheists whatsoever. So if you're going to start saying, well, who ought to have standing of those two groups, an atheist who complains about a cross on a city insignia or an African American who complains that the State is purposefully demeaning him for the purpose of promoting white supremacy, who should have standing to object to that? I think the sliding scale clearly cuts in the favor of the African American plaintiff. Now, I think it was Judge Higgins that asked about the fact that he's Mr. Moore is a State prosecutor. And I want to talk about that, because the case law involving workplace exposure to the Confederate flag very clearly establishes that workplace exposure, even if it's sporadic, even if the employer isn't endorsing it, can constitute a cognizable injury in fact. Now you're getting over into Title VII. Yes. Which you don't claim as a basis for this standing. You keep, you throw out these examples, but as Judge Higginson so aptly pointed out, you cannot cite one case to us that directly on point supports your position that you have standing under the Equal Protection Clause because of what you claim is government speech. That's correct, Your Honor. But I'm trying to look at it from the perspective of what is an injury? What is an injury in fact? And if it's an injury in fact to have that flag waved in your face when you go to your factory job that's owned by ABC Corporation, how can it not be? But the Supreme Court sort of carved out Establishment Clause uniquely, and therefore it would seem that Allen v. Wright is relevant here and difficult for your client to assert stigmatic injury. Well, Allen in the And then when you look at it, to speaking of history, you look at the sort of seminal Equal Protection cases, Loving, the ones that both of you have cited. Those involve treatment. The State won't allow interracial couple to marry. So it isn't as if this is a first impression, suddenly now the problem exists. It's always been there, yet no court has ever recognized the standing description outside of the Establishment Clause context. But again, Your Honor, it's not a court that has rejected it either. There just haven't been Well, the fact that no one's ever gotten into court implies that it hasn't been received. Well, the 211th Circuit cases would suggest those plaintiffs at least got to make their record. They lost on summary judgment. Standing wasn't even raised, wasn't even discussed. Right. So I think those are What's the limit? What's your limiting principle then? In other words, what you probably saw, our court issued a decision relating to monuments. That's government speech. Right. And in that decision yesterday, it highlighted that in New Orleans sort of the robust democratic process. And I think you describe or Judge Reeves does that around the country the use of this symbol has declined. Why isn't sort of Justice Frankfurter's ancient advice that courts aren't enthroned? We should have a militant electorate that decides these issues. Why isn't that the trend that's occurring already? Well, it is a trend that hit a brick wall in Mississippi, unfortunately. Well, it may have before now. But here in this city of New Orleans, the political process came to its conclusion. Why isn't that the same process? The fact that a political process can sometimes, maybe even often, eliminate acts of discrimination doesn't mean that when they say acts, but that that's that's assuming the fact that's in dispute. The government hasn't acted to deprive him of anything. There is a symbol out there. He declares vehemently is offensive. The government has deprived Mr. Moore of a sense of dignity by labeling him a second class citizen. It's the exact same injury that gives rise to standing in dozens, if not hundreds of cases under the Establishment Clause. So where there's no question the Establishment Clause is important. I see that I only have a minute left. Let me just turn quickly to the situation of Plano's daughter. Mississippi law is very different when it comes to schools. Schools are the only place where the law says the flag must be flown. In addition, Mississippi law says that students, like Mr. Moore's now six-year-old daughter in kindergarten, must be taught that symbols, such as the state flag, carry messages and that that message must be respected. When you think about the impact on children, I have to go back to Brown v. Board of Education and I know, yes, there were segregated schools and there was an impact. But remember, the way Brown v. Board was analyzed was the Court assumed the schools were indeed equal, that there was no real concrete impact on black kids versus white kids. But the Court said, still, the psychological impact of that distinction on young, tender minds was determinative. And here, at least with respect to the schools and the Fourth Amendment amended complaint, I think Mr. Moore should have his opportunity to bring his case on behalf of his daughter. Thank you, Counsel. Thank you. May it please the Court, Doug Miracle on behalf of the Governor. I want to start with the discussion of Allen because I think it is instructive. Even in Allen, the Court assumed that there was actual discrimination in the transfer of tax dollars. But they said, our cases make clear that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct. And I think that's the linchpin of this case, as has already been touched on here this morning. The gravamen of Mr. Moore's complaint was that he is being denied equal treatment. And I think the other foundational principle of this case has been pointed out by the Court already is the textual difference between the First and the Fourteenth Amendments. So in the answer to the question posed in Appellant's brief about why there should be no principle or logical difference, the answer to that is the difference is found in the text of the First and the Fourteenth Amendment and the interest through which each of those constitutional provisions and what rights are vindicated or protected through those two separate and distinct provisions. I think they start out by — that's why your opposing counsel started out with Briggs. Isn't that an incongruity that a diagonal cross that's got a very distant religious connotation that maybe nobody would understand is still sufficient to get standing? And yet the battle flag isn't. So the impulse argument is that's an incongruity. Your answer is, well, it's the text of the Constitution. It's the text of the Constitution, but I don't think there is an incongruity in the fact that the Briggs case turned on an Establishment Clause challenge. So while standing was not directly addressed or written about or argued, I think obviously implicit in that notion is when someone brings an Establishment Clause challenge, the Court is analyzing that within the rubric and the established framework of Establishment Clause jurisprudence as has been developed over the last 50 or 60 years. The First Circuit hints in the Sutliff case that there may be an equal protection argument. Your response would be that's dicta that wasn't analyzed, or do you remember that point? Yes, I do. Noncontrolling in the Epling case, I believe the Ninth Circuit in the footnote also said there may be, you know, same type of dicta, certainly not expounded upon, certainly not controlling in this circuit. And I think certainly would be, again, given the nature and purpose of the Fourteenth Amendment Equal Protection Clause, a departure, a clear departure from... What if we just assume hypothetically a sort of concentrated campaign of hateful speech, sort of say as maybe existed at one point against Native Americans? Your argument would be that insular group that cannot have success politically still would never have a chance to object on an equal protection ground? Well, I think the question of whether or not the traditional public display of a nonreligious symbol such as the state flag does not convey any, does not deprive anybody of equal protection. So if we're talking about an equal protection analysis, then I don't think the analysis would be any different given the nature of a nonreligious secular symbol. As this Court said, the flag was engraved. Do you agree that the Sixth Circuit in the Smith case begins to get close? Yes. Go ahead. No, no, go ahead. Well, yes, and actually that was a, that issue was actually raised and briefed in the district court. It was not rebriefed or raised on appeal by the appellant. But certainly the question there was slightly more amorphous, but yet it wasn't because in the, in the municipality, in the municipal district, there were specific percentages and they said, okay, from here on out, there's going to be a, a, a limitation. True, but the Court's decision, the language, the sentence that jumped off to me as sort of getting close to opposing counsel's argument is, quote, First Smith, that inscription written into law over the door of his town is an injury. His sense of community is deeply offended because the doorway to his town is an extension in a symbolic way of his own doorway. I think, though, the, the ultimate issue being that in the future, future further minorities were not going to be allowed into that community. The stigmatizing aspect that Alan talks about, that there must be something personal and concrete as to that plaintiff, the stigmatizing aspect, I agree, gets closer, but there still were concrete formulations that the Court looked at in terms of what that ordinance did and how it caused stigma to someone who was already living there. So I think that, and I think the district court correctly analyzed that, that in light of the allegations that, that plaintiff makes here, that the simple, the public display of the flag in and of itself simply cannot deprive nor create a barrier that, that has not been alleged here. I would also say that, you know, there was a lot of discussion in the district court and in the briefing about this, the, the physical manifestations of what would amount from a stigmatic injury, Mr. Moore has alleged he has these physical manifestations. That gets him no closer under the equal protection analysis, and as the district court noted, those essentially sound in tort and are untethered to any constitutional right guaranteed by the 14th Amendment. And we certainly think that analysis was correct, that even though he's alleged that he has physical manifestations from his distaste towards this symbol, and it was suggested in, in the briefing that the district court erred by making this decision at the motion to dismiss stage and it should proceed to summary judgment or ultimately trial, no modicum of proof is going to change the fact that those physical manifestations are not tied to a stigmatic injury, cognizable injury recognized under the equal protection process. And Mississippi litigation involving this flag has never involved a tort theory? Not to my knowledge. Not the two prior to the Banks case, no. And also in that regard, when you bring up those two cases, both those decisions, you know, commended this issue as being one of a political question. And while the district court did not directly address that, we argued it below, it was not raised, it was not a basis. That seems appealing, and I remember Justice Frankfurter's dissent. But, but it doesn't seem, do we, does the record reflect what the racial makeup was in the referendum vote? That information would have been publicly available during the, from the Secretary of State's office, and the district court noted that based on the percentages, and the district court conveyed this to counsel during the hearing, that based on the percentages, it's, it's understood that some percentage of African Americans voted for the, for the current flag. So to the, to the extent that there were any factual issues addressed at the district level, that was one that was touched upon. So. Explain a little bit, I wasn't totally clear on the briefs on this hearing that was held on the standing issue where apparently plaintiff was allowed to, in effect, present testimony, which is very unusual for a motion to dismiss standing. But tell me how that played out. Following the, I believe it was the filing of the Third Amendment complaint, before any answers or responsive pleadings were due, the court sui sponte directed the parties to brief standing and the political question doctrine, and set a time limit for those. And then following the submissions of briefs, the court scheduled the, the motion to dismiss. We were, the government filed a motion to dismiss as our response in counsel had counsel present who made arguments, yes, you're correct, that, that Mr. Moore also presented what amounted to a question and answer session between the court and counsel at various times when the district court was trying to determine whether or not Mr. Moore had stated or alleged any specific denial of equal treatment under the Equal Protection Clause. I think he notes that in his opinion that he tried to flesh that out. But procedurally, Your Honor, that's how that proceeded. This was a, in response to a sui sponte order from the court to address briefing. And I think that's an interesting point because I think, you know, the, the Eleventh Circuit cases have been alluded to that standing wasn't addressed there. I would submit standing was addressed, I can tell from looking at the lower court proceedings. The state and both, both district court, there were two district court proceedings in Coleman. Standing was raised. The district court said, I find he has standing, but curiously the court cited another Eleventh Circuit case which was very much similar to the Jacksonville contractor's decision which, which said that somebody who, where the government imposes a barrier, then they have sufficient standing for purposes of equal protection. So I would submit that the district court erred in the standing analysis. The state did not then raise that issue again at the Eleventh Circuit. But in answer to your question. Go ahead. You said. So in answer, that's how the procedural posture of this case. Mr. Moore was not under oath. And as a matter of fact, I believe the record will reflect it was a brief exchange with me where we were not alerted to the fact that there would be any testimony. But as an officer of the court and as a licensed attorney in the state of Mississippi, I did not raise any objections as to the court's question of Mr. Moore. It was a combination of argument and testimony. Mr. Moore was represented by counsel at the hearing. He had separate counsel for the first portion of the hearing. The first portion. And then he took over as counsel for the second portion? He, yes. I think that's a fair characterization. He expressed his, his, what would be akin to testimony to the district judge. I think that's a fair characterization, Your Honor. But they were there on a 12B6 motion. They were there on a 12B6 motion. I think the court, in citing the Ramming decision, in looking at issues, we obviously raised the 12B1 and 12B6 when we filed our motion to dismiss subject matter jurisdiction. So the court, citing the factors in Ramming, that he could resolve the matter on the pleadings or through disputed facts. Or through an evidentiary hearing. Or through an evidentiary hearing. Which sounds like something more appropriately resolved on a motion for somebody's judgment, doesn't it? I cannot speak to what the district court had in mind when it questioned Mr. Moore. But certainly the posture was we had filed a motion to dismiss, which included the two factors that we were directed by the district court to address, which was standing and political question. Mr. Moore's counsel presented an argument. I think a lot of it stemmed to the injury factor. We took a recess and then Mr. Moore picked it up from there and addressed standing further his injuries. He was asked questions about his affidavit testimony because, if you recall, the complaint did not make any of these allegations about the physical manifestations of his alleged injury. His affidavit that he submitted in response to the court's order is the first time  So, while I cannot directly speak to what the court had in mind in that posture, it was certainly in response to a 12B1 lack of subject matter jurisdiction, lack of standing raised by the state in response to the court's sua sponte order. I think the court, I do want to address briefly, the court touched on the, and we cite a number of cases. The court asked appellate counsel if they have any cases in this context. The answer is no. We cite a number of cases in our brief from this circuit as well as from the United States Supreme Court as to what is required of a, for standing in the equal protection context. So, to say there is no case that says he can't come to court, I think that's a clever argument, but it flies in the face of the longstanding jurisprudence of what this court, for example, in Bowlby said in 2012 when the court said, you must allege treatment different from those similarly situated. That is completely lacking here. So, under any stretch of the imagination, under any equal protection analysis by this court and the Supreme Court, there is no case that would authorize somebody to have standing to bring a non-economic stigmatic injury outside of the equal protection clause. And we spend a good deal of time, and I probably spend more time than I should have in my brief, on the equal protection issue, I'm sorry, on the establishment clause issue. But that issue was not raised below, and it was raised for the first time on appeal. And so I addressed it in the context of why does it matter. And the reason it matters is the Supreme Court, while it has said there in Valley Forge there is no hierarchy. The purpose of the flag, the display, what is it supposed to represent? Your Honor, I certainly cannot speak on behalf of the Governor what it's supposed to represent. I can say it is a symbol that, and Judge Reeves in his opinion, it's been a very well-written opinion discussing the history of it. But what is it supposed to represent? I think it means different things to different people is what I'm prepared to say. And we are not discounting how Mr. Moore or anyone else feels about the flag. But I also think, Judge, the district court raised an interesting question about why this is so problematic. The court asked Mr. Moore a series of questions about other people or other identities of things associated with Mississippi's history. For example, names of state buildings or names of counties which are associated with the Confederacy. And he said, if we have to remove the flag, why don't we have to then rename all those buildings? Mr. Moore did not seem to be particularly bothered. He said, I don't visit some of those buildings or I don't visit some of those locations, so that doesn't particularly bother me. But that's the problem here is what symbols. But isn't a flag at least in part supposed to represent the people? So the Mississippi flag should represent the people of the state of Mississippi. Do you agree, disagree, or? I agree that the flag represents the— the flag is an embodiment of what has evolved over a period of time, and different people ascribe different meanings to it. Different people, whether they be African American or non-African American, object to— You're telling me what meanings people ascribe to it. I'm asking you whether or not it is supposed to represent the people of the state of Mississippi. Is that what it's supposed to do? Your Honor, here today on behalf of the Governor, I cannot speak to what the flag is supposed to mean because I do think the answer is it means different things to different people. And just as Mr. Moore was not particularly bothered by other symbols that have been associated with Mississippi's past, other people may be equally as bothered by some of those things that he is by the flag. Are you familiar with the Maryland flag? Yes, I am. Describe the Maryland flag. If it's the flag I'm thinking of, it has a multitude of insignia in different colors. I think the University of Maryland actually incorporates that as part of their athletic adornment. But I'm not familiar with the history of— Do you represent whoever founded Maryland? I'm not familiar with— You're not a flagologist. I am not a flagologist, Your Honor. So in closing, we believe that the district court was correct in applying the three prongs of Article III standing. We spent most of the time today talking about injury in fact. Appellants— Before you close, I have just two quick questions. One is they cite a fair bit of scholarship because this is a salient issue. Scholarship, legal scholarship. Yes. Do you have any scholarship that sort of endorses the distinction between establishment clause and equal protection? No. We didn't cite any, and I read a number of that scholarship and some additional scholarship after reading what was cited by the plaintiff. If the Supreme Court were to change towards more of a coercion definition of establishment, would that alter the standing predicament? Just intellectually, would you think it would? I don't believe it would because I don't think, again, the traditional flying of the flag would amount to a coercion. No, I mean would it alter in the world of litigants trying to challenge, say, Ten Commandments and religious symbols? If the Supreme Court were to say we're defining establish more to require coercion, would the state then be able to come in and say you don't have standing because you haven't been coerced? Do you see my point? I do, and I certainly see where you're headed with that. And I think the problem, and I think Judge Barksdale in the city of Austin case noted how elusive standing has been in the establishment clause context. Last question, just because you have two minutes. Would you mind addressing his argument about his daughter? Sure. There's two statutes at issue. I believe when we had the original hearing, his daughter was not in school, so that was one of the grounds that it really wasn't right. But assuming she were in school, neither statute requires any affirmative act on her part or any other student's part. Both statutes simply say that the history will be taught. There's certainly no coercion involved, and as the district court correctly pointed out, if there were coercion of the pledge or anything else, then that would obviously run afoul of other constitutional principles. So we believe that whether she's in school or not in school— Well, the pledge would get you back into under God, but if there were some coercion involved just in terms of sort of vowing, you'd say that could then trigger an equal protection? I think taking the statute on its face at face value and what it requires is that it shall be taught in public schools. I don't think that—I think the district court was correct that that does not provide a basis whether his daughter is in school or not in school and that the educational process certainly does not dictate that those issues not be taught. I certainly think you could construct a set of facts based on that that could put us in a different posture. But on the face of the statute itself, if you were bringing a facial challenge, then I certainly think that the district court was correct in its conclusion. And if the court doesn't have any further questions— Thank you, counsel. Thank you. Rebuttal? Thank you, Your Honor. Let me just address briefly the Allen case again. Now, that is the case which starts off its standing discussion by saying standing is an intensely fact-specific inquiry. It depends on the circumstances and claims made in each individual case. The claims there involved an allegation that the government was not prosecuting adequately third parties. That is classic absence of standing situation where party B says, hey, government, he's breaking the law. Go after him. So that introduction in Allen makes what follows, I think, not at all applicable to this situation. The facts are just too different. The question of the interaction between government speech and equal protection. Judge Higginson mentioned, I think, the Sutcliffe case, which is First Circuit, I believe, and it talks about, well, government speech can violate the— May. Possibly may violate the Equal Protection Clause. And we cite in our brief the Pleasant Grove v. Sumim case, which is kind of the leading edge of modern jurisprudence talking about government speech. And I quote from that decision, but I don't — I didn't quote from Justice Stevens' concurring opinion, but I'd like to just briefly highlight it right now. Justice Stevens, in his concurring opinion in Sumim, says, government speech will not give the government free license to communicate offensive or partisan messages. For even if the free speech clause neither restricts nor protects government speech, government speakers are bound by the Constitution's other proscriptions, including those supplied by the establishment and equal protection clauses. And equal protection is emphasized in the opinion. It's at 555 U.S. 482. There was a question about the referendum vote and, you know, how that broke down on racial grounds. I don't think there's any record that shows, you know, how many black citizens voted for and how many voted against. All I can tell you is that the percentage of people voting against that flag was almost exactly equal to the percentage of black voters in the state. I'm sure some black voters voted for it and some white people voted against it, but the parallel is almost uncanny. Questions about Mr. Moore's statements at the hearing. The judge had some questions for him, which he answered. He offered, he volunteered to take the stand under oath and testify, and both the judge and the state said not necessary. The state unilaterally, after the dialogue between the judge and Mr. Moore, unilaterally stood up and said they accept, as a factual basis, everything he said in the dialogue with the judge. The affidavit that he submitted was an affidavit submitted which is perfectly appropriate in the context of a standing challenge. The Court's required to consider not only what's in the complaint, but once standing is challenged, to consider undisputed facts in an affidavit. And that's what we have. If there is no equal protection case, and this is cutting edge scholarship, where do we look to for a limiting principle? So let's imagine state or Federal executive officers speaking impulsively and saying things that offend people of Mexican or Hispanic origin. That's actionable? And anybody in the country has standing? I think the limiting principle has to be, you do have to look as to whether there is some government as a whole through its authorized processes to. A chief executive officer, governor, president, makes an hateful, offensive statement. I think an individual statement by an individual officer, even if he's the president, even if he's the governor, has never been analyzed or described or scrutinized as government speech. But flags, there was a question about monuments here. Well, flags, and Judge Graves, I think you hit it on the head, flags are the embodiment of the society. When I as an American want to state my loyalty to the country, I pledge allegiance to the flag of the United States. The California flag, an embodiment of the citizens of California, it's a bear. The bear is the California flag. Well, nature and a love for the outdoors may well be, and that may be. Do you think that's why that flag was adopted? I don't know why it was adopted. You don't know why it was adopted? But I do know why and prepared to prove why this flag was adopted. And the Mississippi Pledge of Allegiance also states, Pledge of Allegiance to the flag and to the state for which it stands. Flags stand for the state more than anything else, more than monuments, more than street names, more than names of buildings.  Thank you, counsel.